**STATE of Maine**

v.

**Milton I. WALLACE.**

Supreme Judicial Court of Maine.

Feb. 19, 1975.

Chadbourn H. Smith, Vernon I. Arey, Asst. Attys. Gen., Augusta, for plaintiff.

Bernstein, Shur, Sawyer & Nelson, by Peter J. Rubin, Portland, Joseph L. Singer, Brunswick, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

ARCHIBALD, Justice.

Nine days after he was reported missing, the body of eight year old John Nason was found under a bed in the defendant's apartment, wrapped in a sheet in an "advanced state of postmortem degeneration and discoloration, and gaseous putrification." The ankles were tied together with a wire cord. Cause of death was attributed to asphyxiation. Simultaneously with the discovery of the body defendant was arrested, charged with the homicide and ultimately convicted by the jury of the felonious homicide punishable as murder. He has appealed. Our review of the entire record and the numerous points reserved on appeal convinces us that the appeal is without merit and must be denied.

We will deal with those points of appeal which were briefed and argued, considering the others to have been waived.

## I-A

After the appellant had filed a motion seeking authority to retain a psychiatrist, the State, pursuant to 15 M.R.S.A. § 101, moved to have the appellant "examined to determine his mental condition with reference to the issues of criminal responsibility." This motion was granted over the objection of the appellant, who argues that this procedure violates his privilege against self-incrimination because, in effect, he is compelled to assist the State in furnishing evidence which could rebut the affirmative defense that the criminal act charged was the product of either mental disease or mental defect. This precise issue was recently decided adversely to the position of the appellant. State v. Buzynski, 330 A.2d 422 (Me.1974). We see no occasion to discuss the issue further and adhere to our position in *Buzynski*.

## I-B

Appellant has also argued that, as a matter of due process, no such examination should be conducted by doctors associated with State institutions. He theorizes that doctors employed in state supported hospitals operated for the treatment of those suffering from mental illness would be prone to express an opinion adverse to the person being examined since they would

prefer not to have patients in such institutions who are accused of violent crimes.

Secondly, appellant contends if such a state employed psychiatrist should conclude that the patient was not mentally ill and then, following a verdict of "not guilty by reason of insanity," is required to accept such a person as a patient, the treatment given under those circumstances would, at the very best, be minimal and ineffective.

This argument is supported by neither citation of authority nor the presentation of any facts. Suffice it to say that we do not feel inclined to characterize the motivations of the psychiatric personnel of our State institutions as suggested by this argument. Certainly it is a matter beyond our power to notice judicially. We, therefore, reject this contention.

## II–A

▇ Appellant sought to suppress certain critical evidence found by two police officers in a search of the apartment, including the body of the decedent and numerous items of personal property of both the decedent and the appellant. Following a lengthy hearing on this motion, the Justice refused to suppress the evidence, having satisfied himself "beyond a reasonable doubt" that appellant had consented to the search. He found that the two officers had been voluntarily admitted to the apartment at the specific invitation of the appellant.

Appellant argues the consent to search was illegally obtained because one officer had told the appellant that if he did not give consent, a search warrant would in fact be obtained and that it would be useless under those circumstances to refuse. It is true that a police report signed by one of the officers involved contained this language:

"Det. Perry also requested permission from Mr. Wallace to search the apt. Mr. Wallace agreed to the search. Det. Perry also informed Mr. Wallace that we could go and get warrants to search legally. Mr. Wallace said that was not necessary, that we could search."

At the suppression hearing both officers denied the literal import of this language. Officer Banks, who had signed the report above quoted, insisted in his testimony that Detective Perry had merely told Mr. Wallace that if consent to search was not given, he "would try to obtain a search warrant and search the apartment with one."

Thus, the Justice was confronted with a purely factual problem. He saw the witnesses, heard them testify, both on direct and cross-examination. We cannot substitute our judgment for his on the issue of credibility and, therefore, are unable to say that there was error in his ultimate conclusion that the consent to search was voluntary. Evidence thus obtained is admissible. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Niemszyk, 303 A.2d 105 (Me. 1973).

## II–B

▇ Appellant, apparently recognizing the vulnerability of his initial argument, further urges us to adopt a rule mandating a search warrant in *all* cases where exigent circumstances do not exist. He argues that such a rule would avoid difficult factual questions and would require police officers to meet the Fourth Amendment standards of probable cause. We are not persuaded, in cases involving consent searches, that we should adopt more rigid Fourth Amendment standards than those acceptable to the United States Supreme Court. In *Schneckloth* the Supreme Court specifically ruled that it was

"equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."

412 U.S. at 219, 93 S.Ct. at 2043–44.

We reject this argument.

## III

■ Over objection the decedent's mother was allowed to testify that she had a conversation with her son in the vicinity of 5:00 p.m. on the day that he disappeared. She testified that he had asked her for his allowance of fifty cents which she refused, and he also asked if he could take some of his father's money out of a "penny bank," which request was likewise refused. After these conversations the young boy left the apartment and was never seen again by his mother. The Justice below ruled:

"If there is any hearsay objection, it's being overruled because it's not being offered for the truth and to the extent that it's relevant, to show the boy's activity, it's admissible."

The record also indicates that after John Nason left his mother he was in contact with two other people from each of whom he sought to obtain a small amount of money. This evidence was admitted without objection.

This evidence was relevant to show the activities of the decedent at or about the time of the commission of the crime and we view the testimony as though it was a verbal act descriptive of his activities. We find no error in the ruling of the Justice below. State v. Ranger, 149 Me. 52, 98 A. 2d 652 (1953).

## IV

On cross-examination of the defense psychiatrist homosexuality was characterized by him in this language, "I would consider it a disease or mental defect." The State called a psychiatrist as a rebuttal witness. During the process of his examination he was allowed to testify, over objection, that, in psychiatric terms, sexual deviation is not a disease.

Appellant has argued that the question and answer objected to invaded the province of the jury because whether or not the appellant had a mental disease could only be answered by the jury.

State v. Durgin, 311 A.2d 266, 268 (Me. 1973), defined in general terms the perimeters of expert psychiatric testimony where a defendant pleads not guilty by reason of insanity. There we held:

"Expert testimony may be utilized to describe the *mental and emotional condition* of the accused at the time the conduct complained of was committed, except that the expert should not give his opinion as to the *cause* of the conduct." (Emphasis supplied.)

In *Durgin* we cited with approval cases from the District of Columbia, Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967), and McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962). These cases elaborated on the so-called Durham rule first established by that same Circuit in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), and subsequently adopted by the Maine Legislature as 15 M.R.S.A. § 102. A closer look now at *Washington* is helpful in resolving the question before us and explaining our language quoted above in *Durgin* where we held a psychiatrist could describe the "mental and emotional condition" of the accused.

In *Washington* the Court denounced expert testimony which consisted merely of psychiatric labels which were nothing more than professional shorthand and meaningless to a jury. It noted a special problem with psychiatrists using such labels as "product" and "mental disease or defect" because they related to the ultimate jury question. The Court ruled it was improper to state whether or not the alleged criminal action was the "product" of a mental disease or defect. However, it went no further.

"It can be argued that psychiatrists should also be prohibited from testifying whether the defendant suffered from a 'mental disease or defect,' since this too is part of the ultimate issue. But unlike the term 'product,' the term 'mental disease or defect' may have some clinical significance to the psychiatrist. . . ."

Washington v. United States, 390 F.2d at 456.

Underlying the court's allowance of such testimony is the requirement that there be a proper distinction made for the jury between the *medical* and the *legal* meaning of "mental disease and defect."

■ The testimony of the State's psychiatrist in the instant case was offered in rebuttal. The defense psychiatrist had made a primary diagnosis of the defendant's mental condition as "sexual deviancy," and when asked the effect thereof on the defendant's behavior control, responded,

"this is a man who has difficulty in impulse control at best, and, the strength of his ability to control impulses would be corresponding with weakened, with the strength of the impulses. In other words, I think there are times when his ability to control is very poor."

On cross-examination this witness was asked if homosexuality was a disease and he responded in the affirmative.

The testimony of the State's psychiatrist, therefore, that sexual deviation is not a mental disease was rebuttal to the testimony of the defense psychiatrist and was relevant since it depicted the seriousness of appellant's condition by establishing its nature as viewed by the medical profession. In this sense it was properly admitted.

Finally, the jury was properly instructed by the Court as to the distinction between a disease or defect in a medical and legal sense and the proper relation of expert testimony to these concepts. "We must as-

sume the jury understood the instructions given it as to its responsibility." *Durgin*, 311 A.2d at 269. We thus find no merit in defendant's argument that the jury more probably than not confused the evidence objected to with the ultimate question it was to decide.

V

■ The appellant signed two statements which, admittedly, were inculpatory. Following a lengthy preliminary hearing in the absence of the jury, both statements were found to be admissible and were made available for the jury to consider. Appellant now argues that the admission of these statements was error because they were involuntary.

The second statement contained these words:

"[T]he only promise that Detective Perry has made is that he would see that I get the help I need at Augusta State Hospital."

Rather than reviewing the record in detail, since the Justice below accurately summarized the ultimate facts, we quote his ruling:

"THE COURT: Now, with regard to the statements taken by Detective Perry from the defendant, Milton Wallace, on June 22nd at the Freeport Police Department, the Court finds and is convinced beyond all reasonable doubt that prior to the taking of those statements, Detective Perry did give to the defendant the warnings required by the decision of the United States Supreme Court in Miranda against Arizona. I would indicate however, that despite the giving of those warnings, Detective Perry came very close to violating what this Court considers to be the underlying principle in the case of Miranda against Arizona. In the decision in that case, the United States Supreme Court made it very clear that the mere mechanical reading of the

Miranda warnings to a defendant or prospective defendant did not satisfy the constitutional requirements, that it must be made clear that no action of the officer's occurred which tended to offer, which tended to overbear the defendant's will to resist or tended to induce the defendant improperly to forego the rights which are guaranteed to him. Detective Perry, by his own testimony, did, at one point in the interrogation, indicate to the defendant that he would attempt to secure medical assistance for the defendant. And, I believe that that comes very close to violating that underlying principle of the Miranda decision. However, on my review of the entire evidence relating to the admissibility of the statements, I am satisfied beyond all reasonable doubt that any such statement made by Detective Perry was not the precipitating cause of the defendant making whatever statements he made. I am also convinced beyond all reasonable doubt that the defendant intelligently and knowingly waived the rights which he had and . . . of which he had been informed by Detective Perry. . . . Doctor Fuchs expressed the opinion that the defendant, Milton Wallace, could comprehend the meaning of the words which were said to him, but that he could not appreciate and understand the significance and ramifications of giving up the rights which were guaranteed to him under the Miranda decision. I find it difficult to accept Dr. Fuchs conclusion in that regard. This Court, having reviewed the totality of the evidence, is convinced beyond all reasonable doubt that indeed the defendant did comprehend the ramifications and significance of the warnings which had been given to him and of his waiver of the rights contained in those warnings. In reaching that conclusion, this Court relies upon several items of evidence which it feels most persuasive in this regard. First, the defendant had, at least there is evidence which permits this Court to conclude, that the defendant had, prior to making any statements, attempted to develop a defense to the charge by requesting Mrs. Lounsbury to provide him with what might be described as an alibi. This certainly evidences understanding that he was, in the future, likely to be subject to criminal prosecution. The statements themselves which were offered at the suppression hearing, indicate that the defendant understood and comprehended the significance of what was occurring and what would occur in the future by his own acts of inserting, without suggestion from anyone, into one of the statements, the indication that Detective Perry had suggested to him that there would be some medical assistance provided to the defendant at the Augusta State Hospital. Further, the defendant's statements denying any implication in the criminal activity here involved when first interrogated both on June 21st and on June 22nd, indicating that the defendant appreciated that he was being interrogated in connection with the criminal offense with a view to prosecution and that he had the ability to understand and take steps to guard against his doing anything which might implicate him in any pending criminal charges. Finally, the testimony of the defendant himself indicating first, that he did not intend to say anything which indicated that he had actually killed the boy, again, evidencing in this Court's judgment an understanding of the significance of what he was doing when he made a statement and most significantly, the defendant's ability on the witness stand to verbalize the distinction which Dr. Fuchs described between comprehending the meaning of the words and understanding their true significance. He testified that he did understand the meaning of the words, but he did not comprehend their true significance, his ability to verbalize that at this time and taken together with Dr. Fuchs testimony indicating that the condition which he observed was a continuing condition and probably exists at the present as well as

having existed on June 22nd, leads this Court to the conclusion that beyond all reasonable doubt, the defendant intelligently and knowingly waived his rights to remain silent and waived his right to have counsel present during the interrogation and waived his right to have an attorney appointed and to talk with that attorney prior to any interrogation. When we get to the issue of due process, voluntariness, if I may use that phrase, this Court is convinced beyond all reasonable doubt again, viewing the totality of the circumstances under which the confession was, or admission was given, that the defendant did voluntarily . . . make the statements which are here in issue. Therefore, having concluded that on constitutional grounds, beyond all reasonable doubt, these statements should be admitted and are voluntary and not in violation of the defendant's rights under Miranda, the Court will admit those statements into evidence. . . ."

Our analysis of the record furnishes no basis to challenge any of the factual conclusions reached by the Justice.

We have held in connection with a challenge to the admissibility of a written confession:

"Review proceeds on the basis that the presiding Justice will be sustained if, in accordance with the correct legal principle specifying the ultimate burden and requisite cogency of proof, the evidence provides rational support for the conclusions he reached."

State v. Collins, 297 A.2d 620, 625 (Me. 1972).

The ruling now being reviewed falls squarely within the above holding. Duguay v. State, 309 A.2d 234 (Me.1973); see State v. Hazelton, 330 A.2d 919 (Me. 1975); State v. Peabody, 320 A.2d 242 (Me.1974); State v. Fernald, 248 A.2d 754 (Me.1968). There was no error.

## VI

The appellant seasonably requested the following instruction, which was denied.

"10) The matter of sentencing is for the court and not a matter with which you are to be concerned. However, if you find the Defendant not guilty by reason of insanity, he will be confined to a mental hospital until it is determined that he can be released without likelihood of causing injury to himself or others."

Appellant acknowledges that State v. Park, 159 Me. 328, 193 A.2d 1 (1963), considered and rejected a similar requested instruction, but he urges us to reconsider this position on the basis of Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958). The *Park* Court rejected this identical argument and declined to follow *Lyles*.

Although *Park* has been rather consistently cited with approval in the intervening years by our Court, it has not been so cited as continuing authority for the point here argued because the precise issue has not been raised. However, a large majority of the jurisdictions that have considered the problem seem to agree that it is improper to instruct the jury concerning the impact on a criminal defendant if he is found not guilty by reason of insanity. Lonquest v. State, 495 P.2d 575 (Wyo.1972), cert. denied, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed. 2d 299 (1972); People v. Adams, 26 N.Y. 2d 129, 309 N.Y.S.2d 145, 257 N.E.2d 610 (1970), cert. denied, 399 U.S. 931, 90 S.Ct. 2262, 26 L.Ed.2d 800 (1970).[1] *See* Annot., 11 A.L.R.3d 737, 745.

If the requested instruction is given, it is arguable that a jury might be reluctant to find a verdict of not guilty by reason of insanity on the assumption that the defendant will go free. On the other hand, we feel it equally logical to conclude that such

---

1. Both *Lonquest* and *Adams* cite *Park* with approval.

an instruction could prompt a jury to find insanity where the evidence might not otherwise warrant such a finding.

Furthermore, if it is proper to inform the jury that commitment to a mental institution results from a verdict of not guilty by reason of insanity, it would be equally appropriate that the jury be aware of the statutory provisions for subsequent release. Because of the numerous approaches authorized by 15 M.R.S.A. § 104 to resolve this subsequent issue of "whether [a person found not guilty by reason of insanity may be released or discharged] without likelihood that he will cause injury to himself or to others due to mental disease or mental defect," no instruction could adequately postulate the impact of such a verdict on the appellant's future tenure in the institution. We agree with the Delaware Court (responding to a similar contention) that "[s]uch instruction would have substituted one unacceptable area of speculation and conjecture for another." Garrett v. State, 320 A.2d 745, 750 (Del.1974).

On balance, we are not persuaded that *Park* should be overruled. There was no error in refusing to give the requested instruction.

## VII

Appellant seasonably requested the following instruction:

"There is a rule of law which is called the felony-murder rule. If a death occurs in the process of the commission of a felony under circumstances which indicate that death may occur as a natural and probable consequence of the commission of the felony, then you may infer from the facts that the defendant possessed the requisite malice aforethought so that he would be guilty of murder under the felony-murder rule. However, the State has the burden of proving beyond a reasonable doubt that the death did occur under such circumstances and that the inference of malice afore-

thought should be drawn by you as jurors. . . ."

The Justice below declined to use this language but instructed as follows:

"[M]alice may be implied when the unlawful killing results from the commission or attempt to commit any felony. In this regard, I instruct you that sodomy is a felony . . . ."

After the jury had deliberated for some time, and acting on its request, the Justice elaborated on this concept by this instruction:

"[M]urder is the unlawful killing of a human being with malice aforethought. If you find that there is an unlawful killing as I have described those terms to you earlier, you should then consider whether there was malice aforethought. Malice aforethought may be implied when the unlawful killing results from the commission or attempt to commit any felony. I further instruct you that sodomy is a felony."

Appellant argues that this instruction was erroneous because it failed to include (a), the necessary admonition that there must be a causal relationship between the felony and the death and (b), that the jury should have been told that since the felony-murder rule had application only under those circumstances where the natural and probable consequences of the commission of the felony would be either death or serious bodily injury, the felony-murder instruction as given was incomplete and prejudicial.

The felony-murder rule has rarely been considered in isolation by our Court. It was suggested at an early point that legal malice may be implied where the defendant was in the commission of a felony and in the perpetration of that offense a killing occurs. State v. Smith, 32 Me. 369 (1851). In a writ of error seeking to reverse the judgment resulting in *Smith*, the Court, relying on common law concepts, held:

"When death ensues in the pursuit of an unlawful design, without any intention to kill, it will be either murder or manslaughter, as the intended offense is felony or only a misdemeanor."

Smith v. State, 33 Me. 48, 55 (1851).

In 1972 we quoted with approval this instruction given by a Justice of the Superior Court:

"[I]f a person is engaged, and I mean by that is presently engaged in the commission of a felony and if while so engaged in the commission of a felony the death of another person results, such a person would be guilty of murder because the law would imply malice from the fact that the person was engaged in the commission of a felonious act."

State v. Trott, 289 A.2d 414, 417–18 (Me. 1972).

In *Trott* the language so approved must be read in the context in which it was used. This may best be illustrated by quoting exactly the language found in Footnote 7:

"As the facts were postured, the jury could have found any one of three felonies committed resulting in the death of the decedent. It must be noted that the res gestae embraced one continuous act commencing with the altercation at decedent's home and culminating when decedent was cast alive into the sea to drown. *In his explanation of the felony-murder rule,* the presiding Justice adequately defined each of the three possible felonies, robbery, assault with intent to rob, and assault and battery high and aggravated. The act of carrying the decedent, either unconscious or unable to resist, to the wharf, and casting him alive into the sea was itself assault and battery high and aggravated *since it was an act of such a nature as to cause death or serious bodily harm. When in fact death did result the felony-murder rule had application."* (Emphasis supplied.)

289 A.2d, n. 7 at 418.

Initially, we observe that causation is a necessary segment of the felony-murder rule. The death must be the result of either the commission of, or the attempt to commit, a felony. This seems implicit in the language quoted in Footnote 7, namely:

"When in fact death did *result* (i. e., from assault and battery high and aggravated) the felony-murder rule had application." (Emphasis added.)

289 A.2d, n. 7 at 418. *See* 40 Am.Jur.2d, Homicide § 74.

If an instruction is both correct and linguistically adequate to convey an understanding of the legal rule involved, we find no error in failing to elaborate thereon, even though requested to do so. The Justice below on two occasions in his instructions pointed out to the jury that the unlawful killing must be the *result* of the commission (or of an attempt to do so) of a felony, namely, sodomy, before it could imply malice aforethought. It is unnecessary to give a requested instruction if the content of the requested instruction is adequately covered by that actually given. State v. Mimmovich, 284 A.2d 282 (Me. 1971).

The next point merits more serious consideration. If we understand appellant's position correctly, he is urging us to construe our felony-murder rule as requiring it to be limited to felonious acts committed in an inherently dangerous manner.

Unlike most jurisdictions where statutes have been enacted incorporating a felony-murder rule, our Legislature has never done so.

Both the English and American courts seem now to agree, as contrasted with earlier holdings, that the felony-murder rule does not include any and all felonies, but only those either *inherently* dangerous or those which are committed in a dangerous manner. Some states limit the scope of

the rule to those felonies which are, in the abstract, inherently dangerous, such as rape, robbery, or burglary. *See* People v. Satchell, 6 Cal.3d 28, 98 Cal.Rptr. 33, 489 P.2d 1361 (1971). Others adopt a broader view, namely, that the rule includes, but is not limited to, felonies which are inherently dangerous. Under this approach any unspecified felony which is either inherent ly dangerous to human life *or* foreseeably dangerous to human life due to the circumstances of its commission falls within the felony-murder rule. *See* State v. Thompson, 280 N.C. 202, 185 S.E.2d 666 (1972); People v. Golson, 32 Ill.2d 398, 207 N.E.2d 68 (1965).[2]

In England the rule now makes the commission of a homicide in the perpetration of a felony murder if the felony being so perpetrated is executed in a dangerous way. *See* Annot., 50 A.L.R.3d 397, 403. Professor Perkins uses this language:

"One who is perpetrating a felony which seems not of itself to involve any element of human risk, may resort to a dangerous method of committing it . . . . If the dangerous force thus used results in death, the crime is murder just as much as if the danger was inherent in the very nature of the felony itself."

R. Perkins, Criminal Law 34 (1957).

In Smith v. State, *supra*, the Maine Court reverted to the common law for its statement of the felony-murder rule. Despite the fact that many state legislatures have given a statutory definition to felony-murder, the Maine Legislature has never done so.[3] The statute today uses essentially the same language that existed when State v. Smith, *supra*, was decided. Our Court did not again comment on this rule until it announced its decision in State v. Trott, *supra*. As we now read the instruction approved in *Trott* in the context of the comment in Footnote 7, we may paraphrase what we conceive to be the ultimate holding in *Trott*:

The law would imply malice from the fact that the person was engaged in a felonious act committed in such a manner as to cause either death or serious bodily harm.

■ To summarize, the felony-murder rule in Maine requires in addition to a causal relationship between the felony being committed, or attempted, and · the death, proof beyond a reasonable doubt that the manner or method of its commission, or attempted commission, presents a serious threat to human life or is likely to cause serious bodily harm. This holding we feel comports with the traditional con-

2. The Model Penal Code suggests in Section 210.2 the following concept:
"(1) Except as provided in Section 210.3 (1)(b), criminal homicide constitutes murder when:
(a) it is committed purposely or knowingly; or
(b) it is committed recklessly under circumstances manifesting extreme indifference to the value of human life. Such recklessness and indifference are presumed if the actor is engaged or is an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, rape or *deviate sexual intercourse by force or threat of force*, arson, burglary, kidnapping or felonious escape." (Emphasis supplied.)

3. It is true that section 2 of chapter 154, R.S.1840, mandated the death penalty for the felonious homicide punishable as murder

if committed "with express malice aforethought, or in perpetrating or attempting to perpetrate any crime punishable with death, or imprisonment in the state prison for life, or for an unlimited term of years." With the abolition of the death penalty in Maine, section 2 was ultimately repealed. R.S. 1903, ch. 119, § 1. Since section 1 of chapter 154, R.S.1840, retained the classic language, to wit: "Whoever shall unlawfully kill any human being, with malice aforethought, either express or implied, shall be deemed guilty of murder," and since no succeeding legislature has departed in any essential way from this language, it is clear from this statutory history that the legislatures between 1840 and 1903 were concerned only with punishment and in no way intended the repeal of section 2 as a departure from the common law concept of felony-murder. *See* Jenkins v. State, 230 A.2d 262 (Del.1967).

cept of the rule and is consistent with the common law as developed.

We now revert to the charge as given. The jury could reason, from the language used, that if death merely resulted from the commission of sodomy, the crime committed was murder.

Of course we must agree that there are certain types of conduct falling within the proscriptions of sodomy which may be engaged in without creating a foreseeable danger of serious bodily harm or pose a serious risk to human life as, for example, such acts between consenting adults. However, this is obviously not true for all conceivable acts which may come within the general definition of this crime. In short, while force and violence are not necessarily involved in committing this crime, it may equally well be committed by the use of potentially deadly force.

Since the jury was not admonished that the act of sodomy must be committed in such a manner as to cause serious bodily harm or to threaten human life, we must hold the instruction deficient. However, it does not automatically follow that the error will result in reversal. Rule 52(a), M.R.Crim.P., allows us to go further and consider whether such an error affects "substantial rights" of the appellant. State v. Heald, 307 A.2d 188 (Me. 1973). So, we must inquire whether, on the facts in the record, the incomplete instruction was prejudicial or was harmless beyond a reasonable doubt.

We summarize the facts.

The eight year old boy was seen alive by several people prior to 6:30 p. m. on June 13, 1972. At about that time, he met the appellant as he was entering his apartment. The chilling words of appellant best describe the ensuing events:

"On Tuesday, June 13th, I was drinking all day with Eddy Wilbur. I came home from Eddy's somewhere around 6:30. I was drunk at this time. On the way home, Betty Brewer said, you're drunk. She was on the sidewalk in front of the house. I went up to my room, Johnny was on the sidewalk at that time, but he didn't come into the building at that time. I went up to my room and Johnny came in behind me. This was sometime after 6:30 on Tuesday. I took Johnny's pants off. I was so drunk I put the sneakers in the ice box. He got mad and ran for the door. I grabbed for him but tripped and grabbed him by the ankle. That was the way I got him. He hollered, if he hadn't hollered, I wouldn't have touched him. He hollered, Daddy. I remember pulling him back towards the bedroom, he stopped hollering. I might have told him if he didn't stop hollering, I'd kill him. I dragged him back, I probably played with him but I don't remember. I remember that we were on the bed, Johnny's sneakers were on the floor, that is what I tripped over. I'm sure Johnny was already placed under the bed when I put the sneakers in the refrigerator. He was wrapped in the quilt or blanket from the bed then rolled off the bed, my girlfriend Liz came up shortly afterwards and we stayed and watched TV until 11:00 o'clock."

The medical examiner testified that the body was wrapped in a "white quilted sheet" with the "ankles bound rather tightly by an insulated cord." Death was attributed to asphyxiation caused by placing "perhaps a pillow . . . or some soft material . . . over his face, possibly even by a hand being put across his mouth and holding his nose in this fashion . . . ."

Postmortem examination revealed certain abrasions in the rectum and adjacent hemorrhaging which had occurred "within 24 hours and no more than 48 hours preceding death," a more precise time being impossible to fix due to the general disinte-

gration of the body. The observed rectal damage "was inflicted by the insertion of a blunt object or instrument of some nature." The medical examiner agreed that those abrasions "would be consistent with an act of sodomy."

Hairs were taken from the leg and torso of the decedent. After an examination by the Federal Bureau of Investigation, it was stipulated that "head hairs taken from the defendant exhibited the same microscopic characteristics as hair taken . . . from the leg and torso of John Nason's body" and "none of the hair referred to exhibits the same microscopic characteristics as John Nason's own hair."

■ Faced with these *undisputed facts,*[4] was the appellant prejudiced by the failure of the Justice below to instruct the jury that the felonious crime of sodomy, to support the legal inference of malice aforethought, must be committed in such a manner as to cause death or serious bodily harm?

We have considered the entire record to determine the probable effect of the failure to give the complete instruction delineating the scope of the felony-murder rule. State v. Hilliker, 327 A.2d 860 (Me.1974).[5] We see no reasonable possibility that the jury, if so instructed would have found that the act of sodomy was not committed in a manner dangerous to human life.

It would be completely irrational for the jury, on the facts, to conclude otherwise than that (1) the defendant committed an act of sodomy on this eight year old boy and (2) the felonious act was consummated by such use of force as to pose a serious threat to his life, and (3) death did, in fact, result therefrom. *See* State v. Doss, 279 N.C. 413, 183 S.E.2d 671 (1971).

Thus, we may say, and beyond a reasonable doubt, that the omission was harmless and could not affect appellant's substantial rights. *See* State v. Northup, 318 A.2d 489 (Me.1974).

The entry is:

Appeal denied.

All Justices concurring.

---

4. The defendant did not testify, his sole witness being the psychiatrist whose testimony has been discussed, *infra.*

5. In *Hilliker* a "manslaughter charge" was not given although requested, thus preserving the error for appellate review.