STATE of Maine

v.

Lewis C. ARMSTRONG, Jr.

Supreme Judicial Court of Maine.

Sept. 4, 1975.

**44**

David M. Cox, Dist. Atty., Bangor, Charles K. Leadbetter, Fernand R. La-Rochelle, John R. Atwood, Asst. Attys. Gen., Augusta, for plaintiff.

Vafiades, Brountas & Kominsky, by Marvin H. Glazier, Eugene C. Coughlin, III, Bangor, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD, and DELAHANTY, JJ.

ARCHIBALD, Justice.

Defendant, having been indicted for the felonious homicide punishable as murder, entered pleas of not guilty and not guilty by reason of mental disease or defect. A Penobscot County jury, having heard evidence offered by the State limited to proof of the commission of the crime by the defendant, and having heard defense testimony focused completely on the defendant's mental capacity, returned a guilty verdict. Judgment was entered accordingly, from which an appeal was seasonably taken.

We deny this appeal.

### FACTS

Appellant has argued many points in support of his appeal. In order that we may deal with these points rationally, it is necessary that an abstract of the facts be included.

On February 13, 1973, the body of the decedent, Jeanette A. Moore, was discovered in Room 39 of the Fairmount Motel in Bangor, this being the room which was rented and regularly occupied by the appellant. Medical evidence established beyond any possible doubt that the cause of her death was "asphyxiation due to manual strangulation." The testimony by a medical examiner also established that coincident with her strangulation she had been the victim of severe physical abuse.

The decedent, who was characterized by several witnesses as appellant's "girlfriend," had been seeing him regularly for several months prior to her death. He had frequently visited her home, and had established what would appear to have been a

reasonably good rapport with the Moore family.

We revert now to the evidence dealing with the known activities of Miss Moore and the appellant on the day of her death. The couple left the Moore residence in the afternoon and spent approximately two hours (2:30 p. m. to 4:30 p. m.) in a restaurant in Hampden where they consumed a certain amount of beer. At approximately 6:30 in the evening the tenant in the room adjoining Room 39 in the Bangor motel observed appellant "with a towel wrapped around him . . . headed for the showers," and shortly thereafter noted his return to the room, which did not have shower facilities.

Appellant was next seen in a Bangor restaurant between 6:40 p. m. and 7:20 p. m. Because of his appearance and emotional conduct, the cashier, who knew him, gave more than passing attention to his activities. She noted that his clothes were "clean and freshly laundered," and "it looked like he just had a shower and shampoo." Because her station in the restaurant was within "6 or 8 feet" of the telephone booth, she was able to overhear segments of the appellant's conversation which he had with another person and quoted appellant as saying, "I have done something bad," and, "I love you and I miss you and I want to come home. . . . Will you meet me with a minister."

At 8:45 p. m. a Washington County deputy sheriff, having received a radio communication and having been given certain information from a passing motorist, proceeded to a point on Route 182 in Cherryfield [1] where he observed two vehicles, "a green MG and a blue Dodge pickup with a camper on it." He noted the presence of two persons, one of whom, appellant's father, approached him. As the result of conversation with this person, the officer approached the MG. He testified

---

1. It is approximately fifty-five miles from Bangor to Cherryfield via Route 182.

that the appellant was seated in the vehicle and he proceeded to engage him in conversation. Although the admissibility of the statements made to the officer was challenged (and will be dealt with *infra*), the officer quoted appellant as saying, "I killed her and I want to get her out of there." Additionally, he informed the officer that he was referring to Room 39 at the Bangor motel.

Via police radio this information was transmitted and the officer kept the two vehicles under surveillance until he received a report verifying that a body had been discovered in the particular location given. Shortly thereafter members of the Maine State Police arrived and placed the appellant under arrest.

Although there was additional evidence connecting the appellant to this homicide beyond the statement made to the deputy sheriff, one is of particular and compelling significance. During the course of an autopsy, the pathologist had removed a segment of human skin which he found imbedded in the decedent's hair. This was preserved and ultimately transmitted to the Federal Bureau of Investigation along with known fingerprints of the appellant. As a result of comparisons made between the segment of skin removed from the decedent's hair and the appellant's known fingerprints, an expert from the Bureau was able to testify, "I found out it was the finger, left index finger, of Lewis C. Armstrong."

The same pathologist who had performed the autopsy on the decedent had seen the appellant shortly after his arrest and had observed his hands on which there

were "a few small injuries . . . on the index finger on the left."

Appellant elected not to testify and confined the defense testimony to three witnesses, Halbert Miller, M. D., who specialized in psychiatry; Ulrich B. Jacobson, M. D., a psychiatrist with a sub-specialty in forensic psychiatry,[2] and John E. Burns, a psychologist. The obvious purpose of the defense testimony was to prove the validity of the plea of not guilty by reason of mental disease or defect.[3]

As we initially indicated, appellant urges numerous points in support of this appeal. We will deal first with those points that can be disposed of without extensive discussion.

## I

■ Over objection the jury was instructed the appellant had the burden of proving that the criminal conduct charged against him was "the product of mental disease or defect" by a fair preponderance of the evidence. This identical issue was decided adversely to appellant's position in *State v. Melvin,* 341 A.2d 376 (Me.1975), which affirmed our previous holding in *State v. Buzynski,* 330 A.2d 422 (Me.1974). We see no useful purpose in reiterating the rationale expressed in *Melvin* and *Buzynski.*[4] The instruction was correct.

## II

■ As was the situation in *State v. Wallace,* 333 A.2d 72 (Me.1975), appellant claims error because the Justice presiding declined to inform the jury of the consequences which flow from a verdict of not

---

2. Dr. Jacobson defined this sub-specialty as having to do with the "involvement of psychiatry with the law, those situations that affect individuals when in conflict with the law and also have difficulty psychiatrically."

3. "An accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect. The terms 'mental

disease' or 'mental defect' do not include an abnormality manifested only by repeated criminal conduct or excessive use of drugs or alcohol." 15 M.R.S.A. § 102.

4. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), concurring opinion of Mr. Justice Rehnquist.

guilty by reason of mental disease or defect. In *Wallace* we gave careful consideration to this identical argument and determined "on balance" to retain the practice of refusing to give such an instruction. There was no error.

### III

■ The Justice presiding had been requested to instruct the jury that "expert opinion cannot arbitrarily be ignored and the inexpert opinion of the jurors be substituted in the place thereof in any matter which is within the realm of the expertise." In his brief appellant argues that the instruction actually given, although not necessarily an incorrect legal statement, "lumped all witnesses together which in this instance was erroneous and prejudicial to the Defendant."

We apply the rule enunciated in *Towle v. Aube,* 310 A.2d 259 (Me.1973), and juxtapose the requested instruction against the charge in its entirety. In so doing we find no error. *State v. Palumbo,* 327 A.2d 613 (Me.1974).

The Justice presiding explained at some length to the jury the reasons which allowed the medical experts and "the psychologist" because of their "special training or special experience" to express opinions, whereas "lay witnesses or ordinary witnesses" are not. Having thus differentiated between lay and expert witnesses, the Justice then continued:

> " 'You are not bound by the opinions of either expert or lay witnesses. You should not arbitrarily or capriciously reject the testimony of any witness, but you should consider the testimony of each witness in connection with the other evidence in the case and give it such weight as you believe it is fairly entitled to receive.' And that is applicable to testimony of all witnesses."

*Thompson v. Johnson,* 270 A.2d 879 (Me.1970), is cited in support of appellant's position. *Thompson* was a civil case in which a new trial was ordered on the limited issue of damages because, on the uncontradicted medical testimony, the award was "grossly inadequate." Thus, this case was not addressing the issue raised by the refusal to give the requested instruction but, rather, was evaluating the sufficiency of the verdict in light of undisputed medical testimony. We note, of course, that *Thompson* cites with approval *Pease v. Shapiro,* 144 Me. 195, 67 A.2d 17 (1949), a case which is thoroughly consistent with the instruction now said to be inadequate.

This point is without merit.

### IV

In rebuttal the State had called the decedent's father as a witness and elicited evidence from him that he had never heard the appellant refer to him as "Dad" or some similar familiarity. This evidence was introduced because one of the defense psychiatrists had considered in his diagnosis the supposedly close relationship that had developed between the appellant and the Moore family. He had based this conclusion, in part, on the appellant's use of the terms "Mom" and "Dad." Thus, the jury could understand that such evidence had some relationship to the diagnosis made by the psychiatrist although, of course, this was not the sole basis of the diagnosis.

■ In *State v. Durgin,* 311 A.2d 266 (Me.1973), we delineated the role played by the jury in determining whether a criminal defendant has maintained his burden of proving that the act charged was the product of mental disease or mental defect. *Durgin* makes it clear that although experts may describe the mental and emotional condition of an accused at the relevant time, it is for the jury to say whether such an accused was, in fact, suffering from either disease to the extent necessary to exonerate him from criminal responsibility.

Thus it is that the weight to be given the testimony of an expert by the jury becomes critical and it is quite obvious that the reasons underlying the diagnosis are a proper subject of inquiry.

With this background it is self-evident that the testimony of the decedent's father was relevant and proper for the jury to have before it when evaluating the opinion of the psychiatric expert and is within the standard definition of rebuttal testimony. We held in *Emery v. Fisher*, 128 Me. 124, 125, 145 A. 747, 747 (1929):

> "Rebutting evidence repels or counteracts the effect of evidence which has preceded it. It replies directly to that produced by the other side. . . ."

Evidence is admissible, although purely negative in character, which has a rational tendency to refute the existence of a material fact. *State v. Berube*, 297 A.2d 884 (Me.1972).

The testimony of Mr. Moore was admissible.

■ Appellant also collaterally argues that although the evidence might be admissible, the mere presence of the decedent's father on the witness stand was prejudicial when balanced against the limited value of his testimony. We find no merit in this argument. The jury had been carefully instructed to decide the case "fairly and impartially" and not to be influenced "by sympathy or any bias or prejudice." There being no evidence to the contrary, we must assume that these instructions were understood and followed. *State v. Durgin, supra.*

## V

■ Following appellant's arrest he had been interviewed in Bangor by a State Police detective and had given the detective a statement which could well be characterized as a confession. Prior to trial a motion to suppress this statement was made and heard by a Justice other than the one who presided at the trial. This Justice had ruled that he was satisfied beyond a reasonable doubt the statement was voluntary and denied the motion to suppress. At trial the State introduced the State Police detective for the obvious purpose of having the statement admitted. Prior to the testimony of the detective the Justice presiding heard evidence from at least three officers who testified that after having been given the so-called Miranda warnings appellant consistently refused to discuss the case with them. The detective, who had a personal acquaintanceship with the appellant, then interviewed him alone without reiterating the Miranda warnings and ultimately succeeded in obtaining this statement. The Justice presiding then indicated that if there was objection, he would exclude the statement as involuntary. Appellant's counsel objected and the statement was excluded.

Appellant now argues that he was "prejudicially surprised" when the trial Justice excluded this statement since he had predicated his defense strategy on the assumption, based on *State v. Collins*, 297 A.2d 620 (Me.1972), that the contents of the statement would be heard by the jury. Since he believed that the statement ultimately would be in evidence and because it described in some detail the personal relationship existing between the decedent and the appellant, certain witnesses, including the medical examiner, had not been cross-examined on certain points.

We know of no reason that would have prevented the appellant from having asked leave to recall these witnesses for further cross-examination upon discovering that the statement was not to be admitted in evidence. This was not done. Nonetheless, the right of cross-examination was not impinged by the exclusion of the statement. The unexpected turn of events, even though presenting a dilemma, did not infringe upon any of the appellant's rights. He had full right of cross-examination and

could ask no more. *State v. Berube,* 297 A.2d at 888.

## VI

■ Because the Justice presiding refused to allow defense counsel to ask certain questions on the voir dire of individual jurors, it is now contended that he was deprived of a basis for executing challenges for cause. Four of the proposed questions were instructional in nature, and the other four were aimed at determining whether the prospective jurors agreed with (a) the presumption of innocence, (b) the State's obligation to prove guilt beyond a reasonable doubt, (c) whether they would accept the philosophy underlying the defense of not guilty by reason of mental disease or defect, and (d) whether they would honor an ultimate instruction by the Justice on the issue of mental disease or defect.

M.R.Crim.P., Rule 24(a),[5] gives a presiding Justice broad discretion in the voir dire of prospective jurors. *State v. Hurd,* 288 A.2d 478 (Me.1972).

In deciding this issue we do not have the complete voir dire of the prospective jurors since the appellant elected to include in the record only the voir dire of the twelve jurors who were actually seated. This record, however, does include general questions by the Court to the full venire and we note that the Court excused several for cause. However, in each instance after an examination of the jurors seated by the Court, counsel for the State, and counsel for the appellant, there were no challenges to any of the twelve jurors, even though in each instance an opportunity to do so was provided.

With this background we are unable to distinguish appellant's argument from that advanced in *State v. Pritchett,* 302 A.2d 101 (Me.1973). Weighing the requested questions against those asked of each juror and because the complete voir dire examination was not included in the record, we are unable to say that there was in fact any prejudicial infraction of Rule 24(a).[6]

## VII

Appellant contends that conjoining the instructions to the jury relating to implied malice aforethought with the instruction that the appellant had the affirmative burden of proving the defense of legal incapacity, violates the mandate of *Mullaney v. Wilbur, supra* note 4. He theorizes the jury would infer that it became his burden to negate the presence of implied malice aforethought.

■ This segment of the charge was not objected to pursuant to M.R.Crim.P., Rule 30(b); therefore, our review is limited to the determination of whether the charge contained obvious error which affected appellant's substantial rights. M.R. Crim.P., Rule 52(b). We find no such error.

■ As we have already indicated, we must view the charge in its totality as opposed to looking only at an isolated excerpt.[7] It is upon the following language of the Justice below that the appellant premises his argument:

"[I]t [malice aforethought] is implied where even though the Defendant did not specifically intend that death should result, death resulted from intended conduct so inherently brutal or reckless as

---

5. "(a) Examination of Jurors. The parties or their attorneys may conduct the examination of the prospective jurors unless the court elects to conduct an initial examination itself. If the court elects to conduct an initial examination, when that examination is completed the court shall permit the parties or their attorneys to address additional questions to the prospective jurors on any subject which has not been fully covered in the court's examination and which is germane to the jurors' qualifications."

6. *See Murphy v. Florida,* —— U.S. ——, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

7. *State v. Hudson,* 325 A.2d 56 (Me.1974); *State v. Palumbo, supra.*

to manifest a state of mind equivalent to an intent to kill; and illustrative of that would be an intent to cause serious bodily injury, even though not specifically to kill, or where the probable consequences of such conduct would be to cause death or serious bodily injury; and this follows, because the law presumes or the law says that a person is presumed to intend the natural and probable consequences of his act."

Appellant distorts the plain meaning of the instruction. The Justice pointed out to the jury that it reached the insanity issue only if it arrived at a verdict other than "not guilty." He said:

"[Y]ou only reach this plea if you have been satisfied that the State has proved each and every essential element beyond a reasonable doubt of either murder or manslaughter. In other words, if—if you are satisfied beyond a reasonable doubt up to this point that your verdict should be not guilty of murder and not guilty of manslaughter, then you would have no occasion to consider the plea of not guilty by reason of mental disease or defect."

He emphasized that entering the special insanity plea should not be considered

"as indicating an abandonment by the Defendant of his plea of not guilty. He has a right to plead alternatively."

The Justice then in careful detail analyzed the meaning of 15 M.R.S.A. § 102. Additionally, he cautioned the jury that the enactment of this statute by the legislature "expresses the policy of the state . . . not to allow punishment where the State cannot impose blame."

In summary, we can see no reasonable possibility that any jury could misconceive the clear purpose of the instructions and conclude that the defendant must negate the presence of implied malice aforethought in order to satisfy his burden assumed by asserting the affirmative defense of insanity.

## VIII

 We have previously included in our factual summary the statement that was made by the appellant to a deputy sheriff. Appellant argues that it was error to admit this inculpatory statement since its taking violated *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After having explained his presence at the locus of this conversation and having talked to "Mr. Armstrong, Sr.," the officer walked to the green MG where he discovered the appellant. He testified:

"A Then I talked to Mr. Armstrong. I advised him of his rights.

Q All right. Will you tell us, sir, what rights you advised him of?

A That I was a police officer, that he had an absolute right to remain silent, anything he said could and would be used against him in a court of law; he had a right to counsel and counsel before any questioning. If he couldn't afford one, one would be appointed free.

Q All right.

A And I said, 'Do you want to talk to me?'

Q And what did he say?

A He said he did not.

Q Then what happened?

A Then I asked him—I did ask him again if he understood his rights, and he stated, 'I killed her and I want to get her out of there.'

Q Then what happened?

A Then he said he killed—he was crying at this time, and he stated he killed his girlfriend and that is all there was to it.

Q Now, after the first time he said, 'I killed her, I want to get her out of

there,' did you ask a question at that time?

A I advised him if he understood his rights twice.

Q What did he say the second time?

A As I told you, that he killed her, he wanted to get her out of there.

. . . . . .

Q Then what happened?

A And approximately about that time he told me where the—his girlfriend was, what motel she was in.

Q And do you recall what he said?

A Yes, I do.

Q And what did he say?

A She was in the Fairmount Motel in Bangor.

Q Did he say where in the Fairmount Motel?

A Later on after a few minutes he did, yes.

Q Now, did you ask him where she was?

A Yes, I did.

Q And did you ask him what room she was in?

A Yes, I did.

Q Do you recall what room number he gave you?

A Yes, sir, room 39."

Although the State has argued that *Miranda* is not applicable because this was not custodial interrogation, the appellant not having been then formally arrested, it would be an over simplification to rule the testimony admissible on that basis. As we look at this testimony, we are unable to distinguish the responses here given from those ruled admissible in *State v. Taylor,* 343 A.2d 11 (Me.1975), and *State v. Lafferty,* 309 A.2d 647 (Me.1973), where both responses were spontaneous and where neither was the product of interrogation. Considering the emotional state that the appellant appeared to be in, the officer could not be criticized, after hearing that appellant did not wish to talk to him, for asking him if he understood his right to remain silent. An affirmative answer would have ended the interview but the appellant elected to make the quoted statement. The officer could not be accused of indulging in any subtleties because at that time he knew none of the facts.

The inculpatory statements having been voluntarily made, the officer's inquiry as to where the body might be found falls into the category of a neutral inquiry prompted by the appellant's own statement. As such it was admissible. *State v. Taylor, supra.*

This point is without merit.

## IX

Was it error to deny appellant's motion for judgment of acquittal by reason of mental disease or defect?

In *State v. Durgin,* 311 A.2d 266 (Me. 1973), we analyzed the roles played respectively by the psychiatric experts and the jury in deciding the ultimate question of whether the criminal conduct charged was the product of a mental disease or defect. We concluded that this basic determination should, under the *Durham Rule,* be the responsibility of the jury.

The precise issue was before the Court in *Washington v. United States,* 129 U.S.App.D.C. 29, 390 F.2d 444 (1967). In *Washington* Chief Judge Bazelon, whose historic connection with the *Durham Rule* and its interpretation is well known, concluded that no error existed when the trial Judge refused to order a judgment of acquittal by reason of insanity. No useful purpose would be here served by repeating

the rationale announced in *Washington* beyond noting:

"A judgment of acquittal by reason of insanity is appropriate only when a jury verdict of guilty would clearly violate the law or the facts."

*Id.* 390 F.2d at 446. This conclusion is supported elsewhere. *Mims v. United States,* 375 F.2d 135 (5th Cir. 1967); *People v. Krugman,* 377 Mich. 559, 141 N.W. 2d 33 (1966); *Bowker v. State,* 373 P.2d 500 (Alaska 1962); *see Bradley v. United States,* 447 F.2d 264 (8th Cir. 1971); *Dusky v. United States,* 295 F.2d 743 (8th Cir. 1961).

■ The expert testimony, as we read it, presented the jury with questions of fact. Not only would it be required to decide whether appellant in fact suffered from a mental disease or defect but, additionally, it would be required to determine that the appellant's homicidal act was the product thereof.

The psychologist, who spent considerably more time with appellant than did the two psychiatrists, while agreeing that appellant suffered from a severe personality disorder (a hysterical personality), declined to characterize it as either a mental disease or defect. Whether or not this disorder would ultimately break down into a psychosis was left to speculation.

One of the psychiatrists, basing his diagnosis in large part on the case history and data furnished by the psychologist, reached a contrasting opinion. All of the expert diagnostic testimony was premised in large part on information furnished by consultation with the appellant. The jury was entitled to weigh the accuracy of this information in determining the weight to be given the expert opinions.

As we read the rather extensive expert testimony, we note the air of speculation contained therein. For example, Dr. Jacobson used this language:

"And my theory is—*and I grant you these things are theories because you can't really test them until you get a chance to try them over a long period of time*—is my opinion that Miss Moore became identified with what we in psychiatry call—call his id. . . . *[W]e can speculate, I think—we almost have to speculate at this point,* you know, what was it specifically that triggered the events of that particular day, but the conflict expressed itself on that particular day and his ego, that part of the personality that makes it possible for people to deal with what goes on inside and what is required by the outside, broke down; and he was operating purely at the feeling level, under—no longer under control of his conscious self, almost like his unconscious had taken over." (Emphasis supplied.)

From the expert testimony, which expounded at great length on the relationship existing between the appellant and Miss Moore, the jury could have reached the conclusion that certain comments she made to him could have triggered a reaction in which he, in a rage, choked her to death. Their relationship had been intimate. She was seriously contemplating leaving Bangor and going to Florida and her last quoted words were: "[D]on't use my parents to be something you can't be." In addition there was evidence from which the jury could determine that both beer and marijuana had been consumed during this fatal afternoon.

In view of this contrasting testimony, a jury issue was generated. We are unable to say that a verdict of guilty would clearly violate either the law or the facts. The denial of appellant's motion was proper.

X

The final issue which we must discuss is whether the Justice below erred in denying appellant's motion for a bifurcated trial. As a result of the denial, when the

evidence was finally concluded the case was submitted to the jury under instructions that it resolve all issues, including that raised by the plea of "not guilty by reason of mental disease or defect."

Initially, we note that the record before us is incomplete, appellant apparently feeling that the inclusion of further facts was unnecessary. We have before us only the following docket entries:

(1) "Oct 2, 1973 Motion for *Bifuicated* [sic] trial filed."

(2) "Nov 28, 1973 ORDER FILED: Motion for Bifuicated [sic] trial DENIED."

The order referred to has not been made a part of the record and we are thus deprived of the benefit of the rationale underlying this ruling, nor do we know the type of bifurcated trial that the motion contemplated. For example, appellant may have requested that a single jury determine both issues in separate proceedings or, he may have requested two juries, the second to determine the validity of his plea asserting the affirmative defense of insanity if the first jury found in favor of the State.

Rather than reject the appellant's argument because of an insufficient record, we have determined to deal with at least the perimeters of the issue raised, granting that appellant's right to have us do so was minimally preserved.

In the recent cases of *State v. Melvin*, 341 A.2d 376 (Me.1975), and *State v. Buzynski*, 330 A.2d 422 (Me.1974), we acknowledged the practice of ordering bifurcated trials. In *Buzynski* we merely footnoted that *granting* a defendant's motion for bifurcation was a departure from "past practice." 330 A.2d 424 n. 1. In *Melvin* a bifurcated trial was not requested and it was unsuccessfully argued that the failure of the presiding justice on his own motion to order such a trial resulted in manifest injustice. Thus, for the first time, we must give consideration to the claimed right to have a bifurcated trial when both a plea of "not guilty" and "not guilty by reason of mental disease or defect" have been entered.

In other jurisdictions bifurcated trials are not unknown to criminal procedure. Some states provide for this type of trial by statute. *See People v. Woll*, Colo. 498 P.2d 935 (1972). Other jurisdictions have adopted the practice by judicial fiat. *See Simpson v. State of Delaware*, 275 A.2d 794 (Del.1971); *State ex rel. LaFollette v. Raskin*, 34 Wisc.2d 607, 150 N.W.2d 318 (1967); *Holmes v. United States*, 124 U.S.App.D.C. 152, 363 F.2d 281 (1966). Still other jurisdictions do not approve of this practice. *Murphy v. State of Florida*, 495 F.2d 553 (5th Cir. 1974), affirmed on other grounds in —— U.S. ——, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *United States v. Huff*, 409 F.2d 1225 (5th Cir. 1969); *Sweeney v. State*, 6 Md. App. 431, 252 A.2d 9 (1969); *State v. Forcella*, 52 N.J. 263, 245 A.2d 181 (1968).

None of the jurisdictions that have dealt with the issue of bifurcated trials has found any federal constitutional problem involved with the concept. In *Murphy v. Florida*, 495 F.2d at 557, the Court held:

"Due process does not require a separate trial and the states and their courts are free to determine whether such issues should be tried separately or together."

*See United States v. Huff, supra.* The New Jersey Court did "not see the issue as one of constitutional compulsion." *State v. Forcella*, 245 A.2d at 195; *Simpson v. Delaware, supra.* The United States Supreme Court in analogous situations has never held that merely because separate jury issues are raised a separate trial is necessarily required. *See McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971).

With this background it is clear to us that we are free to adopt or reject the philosophy of bifurcation. This is particularly true in view of our adoption of the Crimi-

nal Rules of Procedure in which is included Rule 57(a), providing:

"When no procedure is specifically prescribed the court shall proceed in any lawful manner not inconsistent with the Constitution of the State of Maine, these rules, or any applicable statutes."

In *State v. Nichols,* 325 A.2d 28 (Me.1974), we discussed the scope that should be given Rule 57(a) and determined that it should not be extended to include "radical, uncommon or unapproved techniques" since its purpose was "to maintain flexibility within the criminal procedure system." *Id.* at 33. As we intimated in *Melvin* and *Buzynski,* bifurcated trials, while neither "radical, uncommon, or unapproved techniques," are procedurally novel in this State. Recalling, as we did in *Nichols* that our Rule 57 is modeled on Rule 57(b), F. R.Crim.P., we agree with the suggestion of Chief Judge Bazelon that the trial judge has it within his discretionary power to avoid prejudice by ordering a bifurcated trial when the circumstances so warrant. *Holmes v. United States, supra. See State v. Melvin, supra.*[8]

In summary, we conclude (1) a bifurcated trial is not automatically required for constitutional reasons when a plea of insanity is entered, but (2) the presiding justice, acting within his discretion, on motion of the defendant may grant such a trial on a proper showing that prejudice would be thus avoided.

Since appellant has not included in the record either his motion for a bifurcated trial or the order of the Justice below in denying the motion, we have no basis to say that his ruling exceeded the bounds of judicial discretion. Viewed retrospectively, we can see no abuse of discretion in light of the facts. Based on admissible testimony no rational jury could ever doubt that the appellant committed the

homicidal act. The critical and seriously contested issue was whether that act was the product of a mental disease. Thus, *in reality* the jury faced a single question and it is self-evident that a bifurcated trial under those circumstances would have been a pointless formality.

Appellant has failed to demonstrate error in the denial of his motion for bifurcation.

The entry is:

Appeal denied.

All Justices concurring.

---

8. In *Melvin* we stated: "We are satisfied that a presiding Justice may properly order such a separate determination of responsibility on appropriate occasions, on motion of the defendant." 341 A.2d at 380.