STATE OF MAINE
*vs.*
PETER B. JENNESS

Kennebec.    Opinion, December 14, 1948.

*James L. Reid, County Attorney for
Kennebec County,* for State of Maine.

*McLean, Southard and Hunt,* for respondent.

SITTING: STURGIS, C. J., THAXTER, MURCHIE, TOMPKINS, FELLOWS, MERRILL, JJ.

FELLOWS, J. This is an indictment in two counts, one count for assault and battery and the second for unlawfully concealing a deadly weapon. The verdict of the jury was guilty on both counts.

The case comes before the Law Court from the Superior Court in Kennebec County, on appeal from denial of motion to set aside the verdict, and on bill of seven exceptions.

The evidence in this affair is complex and conflicting in its details, but, briefly stated, the jury probably found: that the respondent, Peter B. Jenness, and his wife, Katherine M. Jenness, had been having some marital difficulties. They lived in Augusta, but on August 15, 1947, the wife, Katherine Jenness, was visiting at the cottage on Lake Cobbosseecontee belonging to her mother and stepfather, Mr. and Mrs. Ralph T. Park. The respondent went to the Park's cottage to talk with his wife, carrying, as the state claims, binoculars in his hand and a homemade "black jack" in a pocket of his pants. He went into the kitchen and asked for an opportunity to speak to his wife. He was told that he must speak to her outside. When Mrs. Jenness came out of doors the respondent seized his wife's hand and attempted to take a ring, or rings, from her fingers. Mrs. Jenness shouted "Mother — Dad," and Mr. Park came out of the cottage and attempted to stop the quarrel between them by pulling Mrs. Jenness away. The respondent Jenness then grabbed Mr. Park by his shirt. Park testified, concerning this, that "he let go of her and grabbed hold of my shirt with one hand and reached for his hip pocket with the other. I grabbed for his hand and before I did he had hold of the club, and I grabbed it away and hit him and it turned him around. He made a lunge for me and I hit him again, and I saw his head was cut, and I threw the club down." The respondent denied that he was the assailant, and denied that he had the weapon with him. The respondent insisted that he was first to be struck, and by someone from behind. What actually was said, what actually happened, and in what order were the happenings, depends up-

on whether two witnesses for the state or the testimony of the respondent, are to be believed. There was apparently much ill will between the various members of this family, and the guilt or innocence depends on the true facts. It is evident that the jury did not believe the respondent in any particular. No injury was suffered by Mr. Park beyond the torn shirt. The injuries to the respondent, however, were more or less severe.

## FIRST EXCEPTIONS

For the purpose of affecting the credibility of respondent, the respondent was asked, subject to objections and exceptions, the following questions:

"Were you convicted on September 30, 1930 of illegal possession of intoxicating liquor?"
A. "I was."

"On February 23, 1933 were you convicted of the crime of conspiracy in the possession and sale of intoxicating liquor?"
A. "Yes."

"On March 2, 1935 were you convicted of the crime of illegal sale of intoxicating liquor?"
A. "I was."

"On June 18, 1935 were you convicted of the crime of sale of intoxicating liquor?"
A. "I was."

The objections of the respondent are based on the ground that the foregoing questions and answers are in violation of Chap. 265 of the P. L. of 1947 (amending R. S. 1944, Chap. 100, Sec. 128) which statute, as amended, provides as follows:

"No person is incompetent to testify in any court or legal proceedings in consequence of having been convicted of an offence but such commission *of a felony, any larceny, or any other crime involving moral turpitude* may be shown to affect his credibility." (The line through "such," and the italics,

illustrate the changes in the statute made by the 1947 revision).

By this amendment the Legislature plainly intended that only convictions for a felony, or for any larceny, or for a crime involving "moral turpitude," can be shown to affect credibility. Convictions for offenses which are not larcenies or felonies or do not involve "moral turpitude," cannot be shown.

This brings directly before the court the question of whether these sales and the illegal possession of intoxicating liquor are crimes involving moral turpitude. The second question relating to conspiracy, involves a felony, and was admissible. *State* v. *Pooler,* 141 Me. 274, 280; 43 A. (2nd) 353. His conviction of a felony may be shown by his own cross-examination. *State* v. *Knowles,* 98 Me. 429; 57 A. 588; P. L. 1947, Chap. 265.

The two words "moral turpitude" have been defined as "inherent baseness or vileness of principle"; "the quality of a crime involving grave infringement of the moral sentiment as distinguished from *mala prohibita.*" Webster's New International Dictionary. Generally speaking, crimes *malum in se* involve moral turpitude, while most offenses that are unlawful only because made so by statute, do not. "Moral turpitude" implies something immoral in itself, regardless of its being punishable by the law. It is an act of baseness, vileness, or depravity in the private or social duties which man owes to his fellowmen or to society in general, contrary to the customary rule of right and duty between man and man. It is something done contrary to justice, honesty, modesty and good morals. The word "moral," in the phrase "moral turpitude," seems to be nothing more than emphasis on the word "turpitude." See Words and Phrases, Permanent Edition (1940), "moral turpitude"; 41 *Corpus Juris,* 212; 14 Am. Jur. 761, Secs. 11-14; 27 Cyc. 912; 2 Bouvier's Law Dictionary (Third Revision).

384

Driving an automobile while intoxicated involves moral turpitude, but not the driving when merely under the influence of liquor. "Intoxication in the public streets was always an evil thing." *State* v. *Budge,* 126 Me. 223, 228; 137 A. 244, 247; 53 A. L. R. 241.

Under ancient common law one who had been convicted of any criminal offense was not permitted to testify in court, upon the theory that such a person was probably incapable of telling the truth. That idea was early recognized in Maine as incorrect and unjust, and such an individual was permitted to testify, but his conviction might be shown to affect his credibility.

With the growth of the number of laws and regulations found necessary to protect the public under modern civilization, many of our citizens voluntarily or unintentionally have become offenders against the law. It is, therefore, the mature consideration of the Legislature that the commission of one or many of the minor statutory offenses, or the breaking of police regulations, do not necessarily show a tendency to testify falsely. It is the "evil" mind that may do so, and it may also be the person who commits a larceny or a felony.

It is well recognized that moral turpitude cannot be exactly defined by a rule to fit all cases. It may or may not be said to exist, depending on the facts, conditions and circumstances. The record of a conviction does not show moral turpitude when the offense is such that a majority of good citizens would not so consider it, even though other good citizens, with minority ideas of reform, might positively affirm its existence. As stated by Judge Hand in *United States* v. *Day*, 34 Fed. (2nd) 920 (C. C. A. 1929):

"* * * * * All crimes violate some law; all deliberate crimes involve the intent to do so. Congress could not have meant to make the willfulness of the act a test; it added as a condition that it must itself be shamefully immoral. There are probably many persons in the United States who would so regard either the possession or sale of liquor; but

the question is whether it is so by common con-
science, a nebulous matter at best. While we must
not, indeed, substitute our personal notions as the
standard, it is impossible to decide at all without
some estimate, necessarily based on conjecture, as
to what people generally feel. We cannot say that
among the commonly accepted mores the sale or
possession of liquor as yet occupies so grave a
place; nor can we close our eyes to the fact that
large numbers of persons, otherwise reputable, do
not think it so, rightly or wrongly."

We hold that illegal sales, and possession for illegal sales
of intoxicating liquors, do not involve moral turpitude.
Sales, and possession for sale, of intoxicating liquors were
considered entirely proper at common law. *Hamilton* v.
*Goding,* 55 Me. 419; 30 American Jurisprudence, 259,
Par. 14. Intoxicating liquor was freely sold, and it was
not considered morally wrong, by our Colonial ancestors.
When Maine became a State its citizens had the right under
a state revenue license to possess and sell. *Lunt's Case,* 6
Me. 412. The State of Maine is now engaged in possession
and sale of intoxicating liquors with the ballot approval and
direction of a majority of the voters.

The state claims, in its brief, that even if the evidence of
these three records of convictions of illegal possession and
illegal sales of intoxicating liquors was not admissible evi-
dence, it should not be considered prejudicial, and the re-
spondent should "take nothing by his exceptions." These
errors however, were not mere "technical" errors, nor was
the admission of this illegal evidence so unimportant that
it clearly would not, under all the circumstances, affect the
jury decision. The question presented was a question of
credibility. There was the word of a man and his step-
daughter against the word of the stepdaughter's husband
on vital facts, and there was much ill will on both sides.

The attorney for the state intended to totally discredit
the respondent. He may have improperly done so by this
series of inadmissible questions. One question he asked

relating to conspiracy was admissible, because a felony. That question relating to one conviction might or might not indicate to the jury's mind that the witness was unworthy of belief. It was a matter for the jury, and depended on the attitude of the individual jurors. Several inadmissible questions, however, of convictions from which the attorney would argue moral turpitude, might show to the jury's mind a total depravity. If, as the state claims, all these additional and inadmissible questions are not to be considered prejudicial, why did the attorney ask more than the one relating to conspiracy? With an intended prejudice, improperly aroused in the jury's mind by many law violations, logic usually meets with a cool reception. The Legislature has said that such questions should not be admitted, and the court cannot say, as a matter of law, that if several such questions are asked and improperly admitted that they are not to be considered prejudicial under circumstances as here shown. It is not for the court to determine on this record whether there is guilt or innocence. The jury has the right and duty to find a verdict, but they must not find a verdict which may have been influenced by a mass of evidence admitted contrary to legislative order and direction.

Because of our decision that this evidence was inadmissible, as contained in the first exceptions, and because the jury may have been improperly influenced by its admission, it is unnecessary to consider other claimed errors.

*Exceptions sustained.*