LAURENCE T. ADAMS
*vs.*
BERT MERRILL, ALIAS HERBERT MERRILL

Sagadahoc County.   Opinion, June, 1950.

*Edward W. Bridgham,*
*Harold J. Rubin,* for plaintiff.

*Sherwood Aldrich,* for defendant.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

FELLOWS, J.   This action of assumpsit for money had and received, with specifications under omnibus counts, was tried before a jury in the Superior Court for Sagadahoc County.   The jury returned a verdict for the plaintiff for $520.   The case comes to the Law Court on the defendant's general motion for a new trial.   The grounds stated in the

motion are that the verdict is against the law and the evidence. There is no claim for excessive damages.

The specifications under the common counts allege that "on or about December 2, 1946 he (plaintiff) paid to the defendant the sum of $500, and on March 17, 1947 he paid the defendant an additional $500 whereby the defendant was to sell and deliver to him logs at the rate of $30 per thousand feet mill scale or a total of 33,333 board feet, mill scale, but that the said defendant only delivered to the plaintiff 16,000 feet mill scale of logs and refuses to deliver any more to the plaintiff, whereby the plaintiff is entitled to receive from the defendant the sum of $520."

At the trial the plaintiff testified, and offered other evidence tending to prove, that the defendant delivered 16,441 board feet to him under the agreement, and refused to deliver additional logs sufficient to make up the necessary number of board feet paid for by the plaintiff. The defendant claimed that "log scale" and not "mill scale" was the agreement and that he had delivered logs to the plaintiff in excess of 48,000 board feet. The jury returned a verdict for the exact amount claimed by the plaintiff in the declaration.

There is no dispute that there was an agreement between the parties for the purchase and sale of logs at $30 per thousand. It is admitted that the plaintiff paid to the defendant the sum of $1,000. The question of whether log scale or mill scale controlled the measurements became unimportant as the trial progressed, because the defendant's testimony if believed, showed a delivery of logs to the plaintiff which would more than satisfy the contract.

The real question before the jury was the number and amount of logs delivered by the defendant to the plaintiff at the mill of the plaintiff. The question before the Law Court, presented by the motion for new trial, is whether the verdict of the jury was clearly wrong. The defendant as the moving party has the burden of showing that the

verdict was the result of "prejudice, bias, passion or mistake." *Jannell* v. *Myers*, 124 Me. 229; *McCully* v. *Bessey*, 142 Me. 209, 49 Atl. (2nd) 230; *Rawley* v. *Palo Sales, Inc.*, 144 Me. 375, 70 Atl. (2nd) 540.

There is an irreconcilable conflict in the testimony. The plaintiff Adams testified that he received at his mill a total of exactly 16,441 feet, based on the scale of the marker. The marker, whose duty was to determine the number of board feet in the lumber as sawed, kept a record, as he testified, of the days worked and the number of feet sawed each day, which record substantiated the plaintiff's story. Both the plaintiff and his marker testified that all the logs delivered by the defendant to the plaintiff's mill were sawed by the plaintiff before March 17, 1947. All logs delivered by the defendant were sawed, and the total delivered was only 16,441 feet. Another witness for plaintiff testified that when the operation ended in March 1947, all the logs had been sawed with the exception of "four or five" on the bank near the mill. The plaintiff testified that he sold 7,071 feet to a Lewiston lumber company, and of the remainder, 2,000 feet was used to "build the mill and put a roof over the engine and the remainder was in the pit."

The defendant Merrill testified that "before Christmas, when operations ceased for a while, we put 48,000 feet of logs on the ramp," and that in addition to the 48,000 defendant says he delivered in March 9,000 feet more. Defendant "estimated" that in March "there might have been fifteen or twenty thousand there." The defendant stated that he measured the logs that he delivered, although he had no experience in scaling logs. Defendant says he kept a record but "I don't know where it is." The foreman, cutting for the defendant on the defendant's wood lot, stated that he showed the defendant Merrill how to scale the logs and that he as foreman scaled "some of the logs as they were cut" but "didn't scale any of the logs on the brow." The defendant's foreman gave as his judgment that 48,000 feet went to the "brow" at the mill before Christmas, and that

9,000 more went in March. The man who took logs out of the woods in November for the defendant, and who placed them on the "brow" at the plaintiff Adams' mill, said that he hauled "approximately" 48,000, but he did not haul any in March.

Clifford W. Gray, a deputy sheriff called by the defendant, testified that he sold on execution in favor of First Auburn Trust Company against this plaintiff Adams on July 3, 1947, as property of this plaintiff Adams, "logs, lumber, slabs and a Fordson tractor for $480." The property sold had been attached previously and was "close by the mill." On the day of the sale the deputy sheriff said "we estimated 12,000 board feet of logs and about 10,000 feet of sawed lumber." There was only one bidder at the sale, a Mr. Coverly from the bank, and neither this plaintiff nor this defendant were present. The bid was the amount of the execution held by the bank.

The testimony of the plaintiff and his witnesses is that there were only 16,441 feet delivered altogether. The evidence of the defendant and his witnesses was that 48,000 feet of logs were delivered by the defendant before March and 9,000 feet more in March, or a total of 57,000 feet. The plaintiff says that at the time he stopped sawing in March there were no logs on the ramp or about the mill, and that after the plaintiff paid defendant the second payment of $500 on March 6th, there were only "two scootfulls put on" or "approximately" 1,100 feet. The deputy sheriff's testimony however, and the deputy was the only witness on either side who was apparently disinterested, was that later on July 3, 1947 there were 12,000 board feet of logs and 10,000 feet of sawed lumber at the mill. The plaintiff admits that he was "told" logs were sold by the sheriff in July but they could not have been "my logs" because there were "none left, not a single log." The plaintiff further said "I know there were logs bought, I don't know where they came from."

The court does not intend to indicate that the testimony of the deputy sheriff is entitled to full and absolute credence on the question of the amount of logs and lumber belonging to the plaintiff and near the mill. The deputy is only a witness, but his estimate of amount is to be seriously considered as testimony of a disinterested witness who had an official purpose in being there and who had certain duties to perform. As bearing on the correctness of the plaintiff's statement that there was no lumber and that there were no logs during March and after March, in, near, or about the mill (if plaintiff intended to convey that idea), the testimony of a sworn officer of the law, who was enforcing a judgment of the Superior Court, that there were approximately 22,000 feet, should be entitled to very respectful and most careful consideration. There was an execution sale and the deputy sheriff says that he sold the logs and lumber as property of the plaintiff.

The jury verdict of the exact sum of $520 claimed by the plaintiff in his declaration, must necessarily represent the fact that the jury found (as declared in the writ and declaration) that the plaintiff paid defendant $1,000 and only received 16,000 feet at $30, or $480 value, according to the contract. The verdict is wrong because on the plaintiff's own testimony he received at least 16,441 feet, or a value of $493.23. The defendant was not given, under any view of the record evidence, sufficient credit for logs delivered. The verdict is not "supported by the evidence." *Mizula* v. *Sawyer*, 130 Me. 428.

The jury verdict in this case was not the result of "mistake." In our opinion it was plainly "bias" or "prejudice" against the defendant and in favor of the plaintiff. In cross examination of the defendant Merrill, the fact came to the attention of the jury that the mill of the plaintiff Adams, located on the defendant Merrill's property, was sold by the defendant Merrill for $50. The plaintiff testified that its value was $1,000. The defendant admitted that he had no

right or authority to sell. The defendant had no title, no permission, and no bill of sale. He says he had brought no suit in order to place an attachment. He sold without the plaintiff's knowledge or consent at a price fixed by himself. His only excuse was, "he didn't make any effort to move his mill, and in October I sold his mill and got it off of there." The defendant did not even notify the plaintiff that he had sold his mill. The defendant did tell Mr. Coverly of the bank, in January 1948, that he had sold the mill for $50, and a "little lumber" for $25. Mr. Coverly said to defendant "be a good fellow and give the money to Mr. Adams." The defendant Merrill stated that after his talk with Coverly he went to the plaintiff Adams and offered to him the $75, but the plaintiff "refused to take it."

It is interesting to note that this collateral and prejudicial fact, of the unauthorized sale of the plaintiff's mill by the defendant for $50, was brought out at the trial by the attorney for the plaintiff in his cross examination of the defendant, without objection. The plaintiff then in rebuttal, to contradict and to impeach, was permitted (without exception) to testify regarding the sale and to state his opinion that the fair market value of his mill was $1,000. See *State* v. *Kouzounas*, 137 Me. 198.

The high-handed, unauthorized, and perhaps spiteful act of the defendant in thus selling the plaintiff's mill at his own figure of $50 and without notice to the plaintiff, could, and we believe did, unlawfully prejudice the jury. The issue in this case was the amount of logs delivered. No action relative to sale of the mill was before the court. This evidence of the sale, although brought from the lips of the defendant in cross examination by plaintiff's attorney, could well prejudice, whether the questions were intended to raise a prejudice or not. The jury not only lost sight of all the testimony of the disinterested deputy of the sheriff, but the jury also failed to consider the testimony of the plaintiff himself, and failed to allow an admitted credit.

A jury has the undoubted right to accept the testimony on a plaintiff's side as true, unless the circumstances and probabilities reveal a situation that proves the testimony of the plaintiff to be inherently wrong. *Daugraty* v. *Tebbetts,* 122 Me. 397. The jury in the case at bar, however, considered the testimony of neither side. It did not give admitted credit, and awarded the full amount claimed in the declaration. The jury did not even accept the plaintiff's story as true. It is clear that the jury did not attempt to decide the disputed question raised by the testimony as to the amount delivered by the defendant. Because of its prejudice, which may have been a "righteous indignation," the jury took matters into its own hands in an attempt to settle all of the various disputes between the parties, by rendering a verdict in this case for the full claim, without regard to the evidence.

Courts have always endeavored to prevent a prejudicial fact that is not relevant, to "creep" into testimony, and to correct by the charge, so far as possible, the effect when it is inadvertently or boldly brought out in evidence, and not objected to. If it is prejudicial, and if it probably affected the improper decision of the jury, a new trial may be granted on motion. Insurance in a negligence case, *Sawyer* v. *Shoe Company,* 90 Me. 369; *Raymond* v. *Eldred,* 127 Me. 11, 17; *Ritchie* v. *Perry,* 129 Me. 440; other accidents at same place in negligence case, *Johnson* v. *Railroad,* 141 Me. 38, 45; possible or probable improper effect of inadmissible questions, *State* v. *Jenness,* 143 Me. 380, 62 Atl. (2nd) 867, are examples. A general motion will even reach a defect in a judge's charge, without exceptions, if injustice results. *Cox* v. *Insurance Co.,* 139 Me. 167, 172. Jurors are human, and like all human beings are so influenced by extraneous, erroneous, and often malicious, acts or statements, that they fail to distinguish what is important, true, or material. Anything that might prejudice the ordinary person will probably throw the mental viewpoint of some, if not all, the jurors out of alignment. The warnings in a judge's

charge will many times fall on ears deafened by a prejudice. The estimate of the value of vital evidence depends, too often, on the manner in which it affects a juror's likes, dislikes, and emotions. Some prejudices may be laudable, but the court room is no place in which to indulge in any good or bad prejudice where legal and even-handed justice is the goal. A decision influenced by sympathy or prejudice is mob regulation.

The general rule of course is, that the admission of improper evidence is not available as ground for new trial unless objection was made thereto at the time, but when improper evidence is so prejudicial that the jury verdict indicates that an unjust decision was in part due to a sympathy or a prejudice occasioned. by that evidence, the verdict is clearly wrong. *Raymond* v. *Eldred,* 127 Me. 11, 17; *Ritchie* v. *Perry,* 129 Me. 440.

"The jury did not fully and impartially weigh the testimony in the case, that consequently the verdict was manifestly wrong and should not be allowed to stand." *Luce* v. *Davis,* 115 Me. 561, 563.

*Motion sustained.*

*New trial granted*