STATE of Maine

v.

Dennis REARDON.

Supreme Judicial Court of Maine.

Argued Sept. 11, 1984.

Decided Dec. 31, 1984.

James E. Tierney, Atty. Gen., Wayne S. Moss, Asst. Atty. Gen. (orally), Augusta, for plaintiff.

Thomas A. Berry (orally), Boothbay Harbor, for defendant.

Before McKUSICK, C.J., NICHOLS, VIOLETTE, WATHEN and GLASSMAN, JJ., and DUFRESNE, A.R.J.

DUFRESNE, Active Retired Justice.

After a jury-waived trial in the Superior Court (Cumberland County), Dennis Reardon (the defendant) was convicted on each of a two-count indictment charging him respectively with robbery and felony murder, both being Class A crimes under 17–A M.R.S.A. §§ 651(1)(C) and 202. His subsequent motion for a new trial pursuant to M.R.Crim.P., Rule 33, was denied and he appeals from the ensuing judgments. We affirm.

In this appeal, Reardon raises three points in support of his claim that the convictions below should be set aside. First, he contends that the evidence at trial, including all reasonable inferences to be drawn therefrom, cannot constitute as a matter of law *sufficient credible evidence* from which the trial justice as the fact finder was justified in finding beyond a reasonable doubt that Reardon's conduct *in fact caused* the victim's heart attack and death and that such death was *a reasonably foreseeable consequence* of such conduct. Reardon's second argument seeks to discredit completely the testimony of the defendant's alleged accomplice for a multiplicity of reasons, such as his extended criminal record, his mental impairment due to drugs at the time of the incident, his self-interest in throwing the greater blame on the defendant, his actual falling-out with the defendant, the inconsistency of his testimony with prior statements, and in general the vagueness of his assertions surrounding the robbery and other aspects of his activities. All this, Reardon says, precludes a trier of fact rationally finding proof beyond a reasonable doubt of the defendant's guilt of robbery and felony murder. Thirdly, Reardon claims that his murder conviction should be set aside, because the statute itself incorporating as it does the felony murder rule operates unfairly, in that it serves to punish a person for unintended conduct, here an unlawful

homicide, in violation of the fundamental concept in criminal jurisprudence of individual accountability for one's own misconduct. This attack is a vague challenge to the statute on constitutional grounds.[1] We disagree with the defendant's position on all three issues.

The evidence may be summarized as follows: Sean Ritchie at the end of April, 1980, had moved into the State Street apartment that the defendant Reardon occupied in Portland with his friend, Cathy Richards. After sundown on May 31, 1980, so Ritchie testified, both he and Reardon left together the Dunkin Donuts shop on Congress Street with the purpose of obtaining money to purchase narcotics by stealing something from "anywhere available." Sometime later after the two men reached Park Street, they saw an *older man* walking towards them on the same side of the street. "Here's one," said Reardon to Ritchie, while directing Ritchie to cross the street and keep watch for pedestrians and oncoming cars. Ritchie then observed Reardon grabbing this elderly gentleman of 67 years of age by the name of George Webb by the lapel of his coat. He stated that Reardon threw Webb to the ground and snatched the man's wallet, tearing the fabric and lining of the coat in the process. As both of them were running away, Ritchie said that Webb had gotten up, was hollering for them to stop and started running after them. Ritchie further testified that, on their way to the apartment, Reardon threw the piece of cloth ripped from Webb's coat to the street and put the wallet in his pocket; once home free, they removed from the wallet the twenty dollars which it contained and with which they later purchased some narcotics.

Officers Robinson and Pierce of the Portland Police Department testified for the State and from their testimony it appears that they were on duty in the evening of May 31, 1980, and that they had stopped in Gill's Handy Store located at 133 Spring Street at the intersection of Spring and Park Streets at 10:30 p.m. This was a regular routine stop for officers on that beat. The officers recounted that shortly after 11:00 p.m. Mr. Webb, walking by the store, peered in and entered, saying "I've been robbed." He was clutching in his left hand heavy-framed black glasses, which were broken. He showed the officers where the lining and fabric of his coat had been torn. The officers exited the store as Mr. Webb was telling them that two male individuals had robbed him and taken his wallet with twenty dollars in it. The three of them were walking on the sidewalk in the direction of the unmarked police vehicle parked directly in front of the store. Mr. Webb said: "I guess I'll go home," as he was taking a step towards the curb. Putting his hand out towards the police car, Webb was falling backwards, but Officer Robinson broke his fall and eased him to the sidewalk. The officers had noticed Mr. Webb's pale and "pasty looking" appearance, but now they observed "an extreme deep blue discoloration about his neck and up through his face" and his eyes "were partially open and like the pupil area was rolling back towards the top, towards his forehead." Cardio-pulmonary resuscitation proved ineffective, and Mr. Webb was pronounced dead at nearby Mercy Hospital around 12:20 a.m. in the morning of June 1st.

## I. *The robbery as the cause in fact of the death of Webb*

Our felony murder statute, 17-A M.R.S.A., § 202, provides in pertinent part that

 [a] person is guilty of felony murder if acting ... with one or more other per-

---

1. Me. Const. art. I, § 6–A. No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of his civil rights or be discriminated against in the exercise thereof.

Me. Const. art. I, § 9. Sanguinary laws shall not be passed: all penalties and punishments shall be proportioned to the offence: excessive bail shall not be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted.

*See also* U.S. Const. amend. XIV, § 1.

sons in the commission of ... robbery ..., he or another participant *in fact* causes the death of a human being, and such death is a reasonably foreseeable consequence of such commission.... (Emphasis supplied).

This statute must be read together with 17–A M.R.S.A. § 34(4) respecting proof of a culpable mental state in felony murder. Section 34(4) states that

[u]nless otherwise expressly provided, a culpable mental state *need not be proved* with respect to:

A. ...; or

B. Any element of the crime as to which it is expressly stated that it must "in fact" exist. (Emphasis added).

■ Thus, Maine's new criminal code effective May 1, 1976, in introducing its own felony murder rule, provides expressly as basic elements of felony murder under 17–A M.R.S.A. § 202, (1) that the commission of any of the statutorily enumerated felonies in fact causes the death of the human victim involved *and* (2) that such death is a reasonably foreseeable consequence of the commission of such felony. In this, the code was merely declaratory of existing law, since, in order to find guilt under the pre-existing felony murder rule, the State had to prove beyond a reasonable doubt not merely a causal relationship between the felony committed and the death, but also that the commission of the felony itself in the manner or method of execution presented a reasonably foreseeable perceptibility of risk of death. *See State v. Pray,* 378 A.2d 1322, 1324 (Me.1977); *State v. Wallace,* 333 A.2d 72, 80 (Me.1975); *State v. Trott,* 289 A.2d 414, 418, n. 7 (Me.1972).

■ Also, by virtue of the express terms of 17–A M.R.S.A. § 34, which specifies that a culpable mental state need not be proved with respect to any element of any particular crime as to which the statute expressly states that such element must in fact exist, we must conclude that it was the intention of the Legislature, in enacting section 202, the felony murder provision, to prohibit as felony murder the causing of any *unin-*

*tended* death that in fact results as a reasonably foreseeable consequence of an *intended* felony. *See State v. Caouette,* 462 A.2d 1171, 1174 (Me.1983); 2 C. Torcia, Wharton's Criminal Law § 145, at 204 (14th ed. 1979).

The defendant, however, argues that the evidence in this case was insufficient as a matter of law to support proof beyond a reasonable doubt that the commission of the robbery upon the person of Mr. Webb in fact caused Mr. Webb's death. He bases his argument on 17–A M.R.S.A. § 33, which says:

Unless otherwise provided, when causing a result is an element of a crime, causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient.

Reardon claims that there existed concurrent causes which alone were clearly sufficient to produce the death of Mr. Webb *and* that the robbery itself was clearly insufficient. We disagree. As stated in *State v. Crocker,* 431 A.2d 1323, 1325 (Me. 1981):

In every case where causing a result is an element of the crime the State must prove beyond a reasonable doubt that the result would not have occurred *but for* the defendant's conduct. The State may prove either that the defendant's conduct, operating *alone,* produced the result or that the defendant's conduct, operating in conjunction with a concurrent causative condition, produced the result. (Emphasis in original).

Dr. Henry Ryan, Chief Medical Examiner for the State of Maine, testified as a prosecution witness. He stated that Mr. Webb died of a heart attack due to coronary arteriosclerosis precipitated by a stressful incident which he was given to believe was an assault or robbery. In final analysis, he

indicated that in his opinion Mr. Webb's fatal heart attack and death were caused by the robbery. As factors supporting his expert conclusion, he cited the fact that coronary arteriosclerotic disease is very common in people of Mr. Webb's age of 67 years and that the disease was unusually severe in Mr. Webb's case, adding that sudden stresses do play a role in precipitating heart attacks in such circumstances. Dr. Ryan concluded that the precipitating cause of Mr. Webb's heart attack and death was any one of several potential stress-causing incidents, such as the robbery itself, Mr. Webb's chase of his attackers, or his thinking about the robbery soon afterwards, especially in reporting it to the police.

In his extended and comprehensive findings of fact, the presiding justice as the trier of fact found among other things, that the defendant's conduct in using physical force in the manner that he did upon the person of Mr. Webb for the purpose of robbing him of his wallet did cause

such stress to Mr. Webb, that he suffered a heart attack which would not have occurred but for the defendant's conduct and that it was a reasonably foreseeable consequence that robbing Mr. Webb in this manner would cause a person of his age and appearance and of poor cardiovascular condition, which was also reasonably foreseeable, to suffer a heart attack and death.

The Justice further concluded that

it was reasonably foreseeable that as a result of the commission of this robbery Mr. Webb would possibly give chase, would be in a position and would possibly retell the story, both of which events could cause the kind of additional stress testified to by the Chief Medical Examiner, Dr. Ryan, to be a cause of heart attack and death, [and that]

either, by itself [the robbery by use of physical force], or by the chasing after the individuals and attempting to get his property back or in the retelling of the story in reporting that fact to the police

officers just a few minutes later, any one of those or any combination of those would cause the kind of stress which would precipitate the kind of heart attack that Mr. Webb sustained.

When a conviction is challenged on the ground of insufficiency of the evidence, the Law Court will set the conviction aside only if, after viewing the evidence in the light most favorable to the prosecution, no trier of fact, such as the presiding justice in the instant bench trial, rationally could have found the essential elements of the crime beyond a reasonable doubt. *State v. McKenney*, 459 A.2d 1093, 1096 (Me.1983). This is the same test which is applicable, when the issue on appeal is the sufficiency of the evidence to support a jury verdict. *See State v. Snow*, 464 A.2d 958, 961 (Me.1983). In the instant nonjury criminal trial the weight to be given to the State's forensic pathologist's opinion evidence and his credibility as an expert witness rest exclusively within the determination of the trial justice and the Law Court will not substitute its own factual conclusions for those of the single justice who saw and heard the witness. It is for the fact finder to decide the credence to be given the various witnesses and their testimony, including that of experts. *State v. Bridges*, 413 A.2d 937, 941 (Me.1980); *State v. Mann*, 361 A.2d 897, 906, 907 (Me.1976); *State v. Dyer*, 289 A.2d 693, 694 (Me.1972). In evaluating the testimony of the State's expert witness, the presiding justice was entitled to give the evidence the weight he felt it was due, the same as he would with any other type of testimonial evidence. *State v. Ellingwood*, 409 A.2d 641, 645 (Me.1979).

We conclude that there was sufficient evidence from which a trier of fact rationally could have found beyond a reasonable doubt proof of the charge of felony murder in terms of its essential elements, *i.e.* that the defendant's perpetration of a robbery upon the person of Mr. Webb in fact caused Mr. Webb's death and that such death was a reasonably foreseeable

consequence of the robbery. The presiding justice was warranted in finding beyond a reasonable doubt from all the evidence in the case, including the expert testimony, that "but for" the robbery and the immediate sequels to it of chasing his attackers and recounting the distressing episode to the police, Mr. Webb would not have died of heart failure, and that any concurrent cause attributable to his predisposition to heart problems on account of his severe arteriosclerotic condition was not alone sufficient to produce his death. *See State v. Snow,* 464 A.2d 958, 962–63 (Me.1983).

## II. *Credibility of Accomplice*

The defendant's second contention is that the testimony of Sean Ritchie, an avowed accomplice, is so incredible that it was reversible error for the justice below to rely thereon, as he had to, in finding Reardon guilty of both felony murder and robbery. He advances multiple reasons for this conclusion.

■ (1) First, he points to Ritchie's extensive criminal record which is of a serious nature. But a witness' believability in the light of his criminal dossier is exclusively the province of the trier of fact. In *State v. Jenness,* 143 Me. 380, 384, 62 A.2d 867, 869 (1948), this Court stated that the idea that one who had been convicted of a criminal offense was probably incapable of telling the truth was early recognized in Maine as incorrect and unjust. Such an individual is permitted to testify, but his convictions might be shown to affect his credibility. The degree of believability to be accorded the testimony of a witness whose credibility a party seeks to impeach by competent evidence of prior criminal convictions is just one factor to be considered by the trier of fact with all the other evidence in the case in determining what weight to give to the testimony of such a witness. That degree of credence properly to be given may depend to a great extent upon the appearance of the witness on the stand, on his air of candor and truthfulness, on his seeming intelligence and honesty, on his apparent want of bias, interest or prejudice. Competing with such characteristics, the witness' conviction of crime may influence the trier of fact in disbelieving that witness' story in whole or in part. Ritchie's criminal record was a question of fact for the consideration of the presiding justice in this case in assessing the probative value of his testimony in light of all the other evidence.

■ (2) Secondly, Reardon raises Ritchie's admitted abuse of drugs prior to the assault on Mr. Webb as impairing his mental capacity to such an extent that his testimony regarding what happened could not rationally be believed by any trier of fact. We disagree. It was within the province of the presiding justice in this case to determine, whether Ritchie's story was reasonable or unreasonable in view of all the testimony and to what degree his use of drugs on the occasion affected his mental processes and dimmed his memory respecting the events that took place. The fact that a witness was under the influence of drugs at the time of the observations he made respecting an event to which he testifies does not necessarily make his testimony inherently unworthy of credit. The particular circumstances of each case must be evaluated by the trier of fact to determine whether the witness' drug-related condition made him incapable of accurate registration and true reproduction of the details of the occurrence involved. *See State v. Bleyl,* 435 A.2d 1349, 1360–61 (Me.1981); *State v. Manchester,* 142 Me. 163, 164, 48 A.2d 626, 626–27 (1946).

■ (3) Another reason for discounting Ritchie's truthfulness, says Reardon, is his personal interest in throwing more blame on the defendant's conduct than on his own. He asserts that they had had a falling-out and Ritchie wanted revenge, and, even if he was not so motivated, Ritchie colored his testimony against Reardon so as to obtain personal favor with the State in anticipation of sentence on his plea of guilty to felony murder which he had already given as part of a

plea-bargaining agreement. An accomplice's motivations, whether of a self-interest or retaliatory nature, are only circumstances for consideration by the trier of fact in assessing that witness' credibility. The weight of the evidence and the determination of witness credibility are factors within the exclusive province of the trier of fact. *State v. Ruprecht,* 458 A.2d 418, 419 (Me.1983); *State v. Gleason,* 359 A.2d 308, 313 (Me.1976); *State v. Mann,* 361 A.2d 897, 907 (Me.1976). This rule applies, even if the criminal conviction rests on the uncorroborated evidence of an accomplice. *State v. Jewell,* 285 A.2d 847, 851 (Me. 1972). *See also State v. Wentworth,* 366 A.2d 178 (Me.1976).

■■■■■■ (4) Lastly, Reardon questions Ritchie's testimony as too vague and so inconsistent with prior statements made by him that no fact finder rationally could accept his account of the events as proof beyond a reasonable doubt. Again, we disagree. It is the task of the fact finder, here the presiding justice, to resolve inconsistencies and conflicts in the testimony of witnesses, and this is so, even where the inconsistency and conflict exist in the testimony of the State's principal witness. *See State v. Heald,* 367 A.2d 1372 (Me.1977); *State v. Fournier,* 267 A.2d 638, 641 (Me. 1970). We have examined the whole record with care to determine whether, in view of all the evidence, including all reasonable inferences to be drawn therefrom, the presiding justice as the fact finder was justified in believing beyond a reasonable doubt that the defendant was guilty of the crimes of robbery and felony murder as charged. We must answer in the affirmative, because, after examining all the evidence of record in the light most favorable to the State, we, as the Law Court, cannot conclude that no trier of fact could rationally find proof of the defendant's guilt of the crimes charged beyond a reasonable doubt. *State v. Sanborn,* 440 A.2d 1056, 1057 (Me. 1982); *State v. Van Sickle,* 434 A.2d 31, 35 (Me.1981); *State v. Perfetto,* 424 A.2d 1095, 1097 (Me.1981).

III. *Felony Murder Statute is unfair*

■■■■ Reardon has briefed and argued before the Law Court a third point on appeal, the so-called unfairness issue. He claims that the felony-murder rule, as developed in Maine pursuant to statutory enactment and providing homicide liability for deaths occurring in the course of certain select felonies, is fundamentally unfair in punishing individuals for unintended incidents in violation of the basic principle of criminal jurisprudence that punishment for crime be founded on individual misconduct. Nothing in this record shows that this issue was raised in the trial court; accordingly, we review it only for obvious error affecting the substantial rights of the defendant, even though the question involved purports to be of constitutional scope. *State v. Crocker,* 435 A.2d 58, 62 (Me.1981); *State v. Flick,* 425 A.2d 167, 174 (Me.1981); M.R. Crim.P. 52(b). Since the defendant's argument inferentially suggests the alleged invalidity of his conviction because of the unconstitutionality of the felony-murder statute involved in the case, it is proper to entertain the point, even though advanced for the first time on appeal. *State v. Boisvert,* 348 A.2d 7, 10 (Me.1975); *State v. Boyajian,* 344 A.2d 410, 412 (Me.1975). We see no constitutional defect in this statute, nor any fundamental unfairness in its operation.

■■■■ The Criminal Code has established a scale of differences in forbidding conduct resulting in the death of a human being. A person is guilty of murder, if he intentionally or knowingly causes the death of another human being, or he engages in conduct which manifests a depraved indifference to the value of human life and which *in fact* causes the death of another human being. 17–A M.R.S.A. § 201. Thus, the Legislature in "depraved indifference" murder has determined that death-producing conduct objectively manifesting savagery or brutality is a killing of the highest degree of blameworthiness and made punishable by the severest penalties provided

for by law, the same as in the case of an intentional or knowing killing, to wit, for life or for any term of years that is not less than 25. 17–A M.R.S.A. §§ 201, 1251. *See State v. Crocker,* 435 A.2d 58, at 67 (Me. 1981).

 If the death of another human being is caused in the commission of or in an attempt to commit, or in an immediate flight after the commission of or attempt to commit, any one of the enumerated felonies of murder, robbery, burglary, kidnapping, arson, rape, gross sexual misconduct, or escape, the person committing the homicidal act and any other participant in the felony is guilty of felony murder, provided the homicidal act or conduct *in fact* causes the death of that human being, and provided also such death is a reasonably foreseeable consequence of the commission of such felony. 17–A M.R.S.A. § 202(1). The Code further provides as an affirmative defense to prosecution for felony murder that the defendant

A. Did not commit the homicidal act or in any way solicit, command, induce, procure or aid the commission thereof;

B. Was not armed with a dangerous weapon, or other weapon which under circumstances indicated a readiness to inflict serious bodily injury;

C. Reasonably believed that no other participant was armed with such weapon; and

D. Reasonably believed that no other participant intended to engage in conduct likely to result in death or serious bodily injury.

Felony murder is a Class A crime, punishable by a definite period of imprisonment not to exceed 20 years. 17–A M.R.S.A. §§ 202, 1252.

 We do observe that both definitions of "depraved indifference" murder and felony murder expressly require, as an essential element of either crime, that the forbidden conduct constituting depraved indifference to the value of human life in the one case and the conduct of the perpetrator of the felony in the other *in fact* cause the death of a human being. The Legislature, by virtue of 17–A M.R.S.A. § 34(4)(B), further provided that a culpable mental state on the part of the person causing the death of the person need not be proved with respect to the issue of death causation, because the statute defining either crime expressly requires that the forbidden conduct *in fact* causes the death of another human being. Thus, in either case, the depraved indifference murder and felony murder statutes set out to punish death-producing conduct without any need to prove a culpable subjective mental state of mind on the part of the actor. *See State v. Lagasse,* 410 A.2d 537, 540 (Me.1980); *State v. Goodall,* 407 A.2d 268, 279–80 (1979). But, in the punishment aspect, the Legislature has provided different treatment, since the penalty for depraved indifference murder is the same as for intentional-knowing murder, while that for felony murder may not be more than the 20-year limit for Class A crimes. We must recognize that, in setting up a comprehensive schedule of penalties fundamentally fair and proportional to the particular criminal behavior subject to punishment, the Legislature may consider, as we believe it did, that death-producing conduct which manifests a depraved indifference to the value of human life, even when objectively viewed, is so highly charged with death-producing potential that it merits punishment in equal degree with an intentional or knowing homicide. By the same token, the Legislature could properly evaluate to a lesser degree of blameworthiness the homicide which results from the more remote death-producing conduct involved in the perpetration of the stated felonies under the felony murder statute.

 We note also that, in the scale of punishment, at the time of the commission of the instant crime, a reckless or criminal negligence homicide (involuntary manslaughter) or causing the death of another human being under circumstances which would otherwise be murder except that the actor causes the death while under the

influence of extreme anger or extreme fear brought about by adequate provocation (voluntary manslaughter) is punishable as a Class A crime, except when death occurs as the result of the reckless or criminally negligent operation of a motor vehicle in which case the manslaughter is punishable as a Class C crime.[2] Thus, Maine's Criminal Code ascribes the same degree of moral culpability to death-producing conduct in the felony murder scenario as in circumstances where voluntary manslaughter or involuntary non-motor-vehicular manslaughter is involved. In *State v. Pray*, 378 A.2d 1322, 1324 (Me.1977), we pointed out that, even before the adoption of the new Criminal Code, this Court had come to the position of requiring in the application of the "felony murder rule," as with the Code, proof beyond a reasonable doubt not only of a causal relationship between the felony being committed or attempted and the death, but also that the manner or method of its commission or attempted commission presents a serious threat to human life, or, in the words of the Code, that the ensuing death is a reasonably foreseeable consequence of such commission or attempted commission. *See also State v. Wallace*, 333 A.2d 72, 81 (Me.1975). In *Pray*, we rejected the common law concept of unlawful-act manslaughter which we said Maine's new Criminal Code was abolishing (the Code became effective after the commission of the offense in this case). So, we imported as an element of unlawful-act involuntary manslaughter a similar requisite of perceptibility of risk of death which was then recognized in felony murder. We further said in *Pray* at 1324 that Maine's new Criminal Code substituted several types of reckless and negligent homicide in the place of common law unlawful-act manslaughter and adopted "a homicide punishment scheme which makes the penalty commensurate with the defendant's culpability." We concluded in *State v. Crocker*, 435 A.2d at 58 that

[a]lthough it is true that the differences between mere civil liability, manslaughter, and murder are a matter of degree, we will not for that reason alone disturb the legislative determination that established that scale of differences.

We see no fundamental unfairness, as claimed by the defendant, in the State's comprehensive grading for sentencing purposes between the several types of criminal homicides. Reardon's argument to the contrary is without merit.

 In the criminal homicide field the jurisprudence of this State has been constant in maintaining that the *subjective* mental, emotional or other behavioral state or condition of the defendant not be an indispensibly controlling factor in evaluation of the punitive seriousness of the crime. *State v. Rollins*, 295 A.2d 914, 920 (Me.1972). Our Criminal Code has continued this policy of criminal jurisprudence by providing identical penalty categories for homicides in felony murder situations and non-motor-vehicular homicides punishable as manslaughter. All are based on *objective* standards of human behavioral responses. *Id.* at 921. The potential sanction of imprisonment for the period of twenty years in both categories does not denote such punitive severity as to shock the conscience of the public, nor our own respective or collective sense of fairness. By no means was the defendant in this case subjected to cruel and unusual punishment in violation of either the State or Federal Constitution. *See State v. Alexander*, 257 A.2d 778, 783 (Me.1969). We do not believe that a fourteen-year prison term for felony murder, coupled as it was with a similar term for robbery to be served concurrently, is disproportionate to the offense of criminal homicide or offends any prevailing notion of decency and fairness. *See State v. Frye*, 390 A.2d 520, 521 (Me.1978).

---

**2.** The Legislature in 1983 reclassified manslaughter occurring as the result of the reckless or criminally negligent operation of a motor vehicle a Class B crime, punishable by imprisonment not to exceed 10 years. *See* P.L.1983, c. 217.

The entry will be:

Judgments of conviction affirmed.

All concurring.